IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID KETTREN, | )<br>)<br>) |
| Plaintiff, | ) 2:19-CV-1645-NR<br>)<br>) |
| v. | )<br>)<br>) |
| VERIZON NORTH, LLC, | )<br>)<br>) |
| Defendant. | )<br>) |

## MEMORANDUM OPINION

**J. Nicholas Ranjan, United States District Judge**

Following discovery, Defendant Verizon North, LLC moves for summary judgment on all claims in this disability-discrimination case. Applying the familiar standard of Rule 56,[1] because Mr. Kettren has failed to present sufficient evidence to support his claims, the Court will grant the motion.

## BACKGROUND

### I.   Mr. Kettren's employment at Verizon.

Mr. Kettren was a customer service technician for Verizon from August 11, 2014 until December 24, 2018. ECF 44-1, 16:2-8, 17:10-17. The job requirements for

---

[1] Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must ask whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). Thus, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In making that decision, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.,* 486 F.3d 791, 794 (3d Cir. 2007).

that position included bending, kneeling, lifting 75 pounds, and climbing ladders and poles.  ECF 44-1, 24:16-27:5; ECF 37-1, Ex. 1.

At the start of each shift, Mr. Kettren reported to a "ready room," where he and other technicians would receive assignments on their mobile devices.  ECF 44-1, 27:14-30:8.  He was expected to leave the premises by 8:25 a.m. to report to his first assignment location.  *Id.* at 34:18-24.  Mr. Kettren's supervisor at Verizon was an employee named Joshua Claycomb.  *Id.* at 29:6-8.

## II. Mr. Kettren's disability and requests for accommodation.

Mr. Kettren alleges that he is "disabled" within the meaning of the Americans with Disabilities Act, because he has "Barrett's Esophagus" syndrome.  Barrett's Esophagus is a medical condition that results from frequent acid reflux, and induces episodes of cramping, acid reflux, and rapid weight loss.  ECF 1, ¶¶ 9, 11-13.  Verizon does not challenge Mr. Kettren's disability status for purposes of this summary-judgment motion.  ECF 36, p. 25 n.4.

In July 2016, Mr. Kettren requested leave under the Family Medical Leave Act related to his disability.  ECF 37-1, Ex. 2.  He also took short-term disability leave three times during his employment—in October 2016, from February 2017 until April 2017, and from March 2018 until June 2018.  ECF 44-1, 60:13-61:12, 62:21-63:19; ECF 37-1, Exs. 3-5.  By July 2018, Mr. Kettren had exhausted all of his protected leave under the FMLA.  ECF 37-1, Ex. 7.

At Mr. Kettren's request, to accommodate his disability, Verizon authorized Mr. Kettren to perform "light duty" work for approximately five months in 2018.  ECF 44-1, 64:22-67:12.  During that time, several of Mr. Kettren's co-workers allegedly made comments about his light duty and the corresponding increased workload it was causing for them.  *Id.* at 111:1-112:2.  This included, for example, a comment by a co-worker that Mr. Kettren should not be at work unless he could do his job.  *Id.* at 75:4-76:25, 110:20-112:2.  Mr. Kettren alleges that he told Mr. Claycomb about these

comments, and that Mr. Claycomb responded that he "does not deal with drama." *Id.* at 112:3-9.

**III.   Mr. Kettren's suspensions.**

With his doctor's permission, Mr. Kettren returned to full duty on November 4, 2018. ECF 37-2, Ex. G. Subsequently, in December, he was suspended twice, for two days and then five days, after failing to follow Verizon's call-off procedures or report to work on two occasions. ECF 37-1, Exs. 9, 10; ECF 37-2, Exs. I, J, K.

During his deposition, Mr. Kettren testified that he was absent on these occasions due to his recurring illness, and that he was "pretty sure [he] did try" to call off, and possibly left a message, on at least one of the two occasions. ECF 44-1, 97:7-18. He explained that, at Verizon, employees did not call off to their supervisor directly. Rather, they called an automated phone number that was "having issues there for a while," which Mr. Kettren suggests might have caused his absence to turn up as unreported. *Id.* at 96:19-97:18. That said, in his summary-judgment briefing, Mr. Kettren does not dispute that he failed to follow the company's call-off procedures on these occasions. ECF 40, p. 2 ("Plaintiff does not disagree. By way of further response, pursuant to the provisions of the Verizon Attendance Policy, if Mr. Kettren had one more unapproved absence, he would have been terminated.").

**IV.   Mr. Kettren's termination.**

On December 24, 2018, at approximately 8:25 a.m., another technician (Brett Chilcote) notified Mr. Claycomb that a technician in the "ready room" seemed to need assistance. ECF 44-2, 48:8-24. The parties differ as to what happened next.

According to Mr. Kettren, he had reported to work that morning despite "running a high fever," experiencing chills and chest pain, and "literally throwing up." ECF 44-1, 121:2-22. Upon arrival, Mr. Kettren says that he asked Mr. Chilcote to go get Mr. Claycomb, because he didn't know what was wrong and thought he might need to go to the hospital. *Id.* at 122:4-10. Once Mr. Claycomb came to the

"ready room," Mr. Kettren says that he described the symptoms he was experiencing to Mr. Claycomb and indicated that he wanted to walk to the nearby emergency room. *Id.* at 123:6-124:6. Mr. Claycomb allegedly responded that Mr. Kettren "looked bad," and suggested that Mr. Chilcote drive Mr. Kettren instead. *Id.* at 124:17-21.

Mr. Claycomb's version of events is somewhat different. He agrees that he went to the "ready room" after being summoned by Mr. Chilcote, and that he encountered Mr. Kettren there. But Mr. Claycomb testified that, upon arriving in the "ready room," he observed Mr. Kettren either sleeping or with his eyes closed. ECF 44-2, 50:1-4. Mr. Claycomb says that he and Mr. Chilcote attempted to alert Mr. Kettren, who "barely open[ed] his eyes," and responded that he didn't feel well, before closing his eyes as if to go back to sleep. *Id.* at 50:8-20. Mr. Claycomb testified that he then asked Mr. Kettren if he needed to go to the hospital, but Mr. Kettren did not respond. *Id.* at 50:21-23. So, Mr. Claycomb asked again if he "needed to go to the ER," and this time Mr. Kettren indicated that he did. *Id.* at 50:24-25. Mr. Chilcote then drove Mr. Kettren to the hospital. *Id.* at 51:12-15.

Based on the symptoms he observed, Mr. Claycomb explained that he suspected Mr. Kettren might have been intoxicated or under the influence of drugs. *Id.* at 52:16-25. So, after Mr. Kettren left for the hospital, Mr. Claycomb called Verizon's Human Resources Business Partner, Kristin Boyd, to seek guidance. *Id.* at 19:8-20:11, 53:21-54:2. She did not answer. He then called Terri Davis, a Verizon Labor Relations Manager, but she also did not answer. *Id.* at 54:3-6. So, he called Bob Kunkel, a Verizon employee whom Mr. Claycomb knew would soon be replacing Ms. Davis. *Id.* at 54:7-8. Mr. Kunkel answered and advised Mr. Claycomb to call A-Check, a third-party vendor, and describe Mr. Kettren's behavior. *Id.* at 54:9-22. Mr. Kunkel explained that A-Check would confirm whether Mr. Kettren should be required to submit to a "reasonable suspicion drug test," consistent with Verizon's policies and collective bargaining agreement. *Id.*

Mr. Claycomb called A-Check and explained that he believed there was reasonable suspicion to conduct a drug test because Mr. Kettren was having difficulty keeping his eyes open and appeared to be "nodding off" at work. *Id.* at 55:6-15; ECF 37-3, p. 27. A-Check confirmed that reasonable suspicion existed and arranged for a drug and alcohol screening at a MedExpress facility, which was located approximately two miles from the office. ECF 44-2, 55:1-19. Mr. Claycomb then texted Mr. Kettren at 9:21 a.m. to notify Mr. Kettren that he would be picking him up from the hospital once he was released. ECF 44-1, 126:4-12; ECF 37-2, Ex. L. At 10:59 a.m., Mr. Kettren replied that the hospital was releasing him. ECF 44-2, 57:2-10; ECF 37-2, Ex. L. By that time, Mr. Claycomb was driving and did not immediately see the text, so Mr. Kettren walked back to the office on his own. ECF 44-2, 57:2-10; ECF 44-1, 129:14-131:3; ECF 37-2, Ex. L.

At some point after he had returned to the office, Mr. Claycomb saw Mr. Kettren leaving the building and informed him that they had to go to MedExpress for a urinalysis test. ECF 44-1, 131:4-132:12, 135:12-16; ECF 44-2, 60:3-61:6. Mr. Kettren responded by telling Mr. Claycomb that he "had mono" and was not hurt on the job. ECF 44-1, 132:3-12; ECF 44-2, 57:17-23. Mr. Kettren also claims to have shown Mr. Claycomb a doctor's note or discharge slip stating as much. ECF 44-1, 132:4-12, 135:12-16.[2] Despite this, Mr. Claycomb indicated that he did not believe the behavior he had observed was consistent with mononucleosis. ECF 44-2, 21:9-23:24, 49:11-52:25. He therefore told Mr. Kettren that he was still required to submit to drug testing, because Verizon had reasonable suspicion that he had been under the influence of drugs or alcohol at the start of his shift. ECF 44-1, 131:23-132:12, 136:24-

---

[2] Though not clear from the parties' briefing, based on the Court's review, it does not appear that the doctor's note or slip indicated that Mr. Kettren had mono. Rather, it only says that he had been instructed not to work for two days. ECF 41-1.

137:5. Mr. Kettren ultimately got into Mr. Claycomb's car and rode with him to MedExpress. *Id.* at 131:9-132:2.

Upon arriving at MedExpress, an intake administrator asked Mr. Kettren for his identification, which Mr. Kettren refused to provide, giving his name instead. ECF 44-2, 63:17-20; ECF 44-1, 137:6-10. Mr. Kettren then commented that he wanted to talk to his attorney and made a phone call from his personal cell phone. ECF 44-2, 63:20-21; ECF 44-1, 146:3-13. Mr. Kettren asked Mr. Claycomb for the union president's phone number, which Mr. Claycomb provided. ECF 44-1, 137:12-17. Mr. Kettren called the union president (Jarred Hipp), but he did not answer. ECF 44-2, 63:22-23. So, Mr. Claycomb called Mr. Hipp and left a message asking that he call Mr. Kettren back, which he did soon after. *Id.* at 63:24-64:1. Mr. Kettren then spoke to Mr. Hipp, who allegedly told Mr. Kettren that he was busy and would not attend the drug test. ECF 44-1, 137:19-138:4.

Eventually, Mr. Claycomb told Mr. Kettren that he was required to proceed with the drug test. *Id.* at 141:4-10, 145:22-146:2. Mr. Kettren reiterated his refusal to take the test and demanded to be taken back to the office. *Id.* at 144:13-145:5. Mr. Claycomb refused, so Mr. Kettren walked away from the MedExpress and returned to the office on foot. *Id.* at 145:11-21.

After Mr. Kettren had walked off, Verizon advised Mr. Claycomb to notify the local police, which he did. ECF 44-2, 75:15-77:9, 78:19-79:22. A Somerset Police officer called back and told Mr. Claycomb that he would make a suspicious activity report and be on the lookout for Mr. Kettren driving. *Id.* at 79:7-22. Separately, Mr. Kettren also contacted the police to report Mr. Claycomb for not allowing him to leave the MedExpress and allegedly bumping into him when Mr. Kettren attempted to leave. ECF 44-1, 152:18-157:21. Mr. Kettren's call was bounced between the state and local police, and he was ultimately advised that his complaint was either a civil matter or should be reported to the county magistrate. *Id.*

Later that day, Verizon provided Mr. Claycomb with a termination letter to mail to Mr. Kettren, which he did the following day. ECF 44-2, 81:1-25. Verizon's stated reason for Mr. Kettren's termination was his refusal to take the drug test. *Id.* at 81:5-25; ECF 37-2, ¶ 21.

## **DISCUSSION & ANALYSIS**

Mr. Kettren alleges that he was subjected to a hostile work environment, and ultimately fired, because of his "Barrett's Esophagus" syndrome—a medical condition that led him to take several leaves of absence and request light-duty work as an accommodation. He brings claims for discrimination and retaliation under the ADA and the Pennsylvania Human Relations Act as a result.[3]

Following discovery, Verizon now moves for summary judgment. In its motion, Verizon argues that Mr. Kettren failed to provide sufficient evidence to substantiate his hostile work environment claim and, further, that he has waived that claim by failing to defend it in his opposition brief. Verizon also argues that Mr. Kettren has failed to establish either causation or pretext as to any of his claims, because he has cast no doubt on Verizon's explanation for his firing. That is, according to Verizon, there is no genuine dispute that Mr. Kettren was fired for refusing to take a drug test required by its policies, after his supervisor observed him "nodding off" or exhibiting other signs of illness at the beginning of his shift.

For the following reasons, the Court finds that Verizon is entitled to summary judgment.

---

[3] Although labeled as a "discrimination" claim, it is clear, based on what was pled, briefed, and argued at oral argument, that Mr. Kettren's "discrimination" claim is, in fact, a "hostile work environment" claim under the ADA and PHRA. That is, the "discrimination" alleged by Mr. Kettren is the existence of a hostile work environment, in the form of comments by Mr. Kettren's co-workers regarding his light duty and medical leave. For clarity, the Court will refer to Mr. Kettren's "discrimination" claim as his "hostile work environment" claim.

### I.      Mr. Kettren has waived, withdrawn, and failed to substantiate his hostile work environment claim.

Mr. Kettren agreed to withdraw his hostile work environment claim during oral argument. *See* Transcript of May 6, 2021, Oral Argument, 18:20-19:7 ("THE COURT: …I don't see any argument in the opposition … that argues that Mr. Kettren has asserted a hostile work environment claim. Are you withdrawing that? MS. WILLIAMS: Yes, we are. … This is strictly a retaliation case at this point.").

Even if he had not done so, the Court agrees with Verizon that this claim has been waived by Mr. Kettren's failure to respond to Verizon's arguments. *See Reeves v. Travelers Cos.*, 296 F. Supp. 3d 687, 692 (E.D. Pa. 2017) ("When a party opposing summary judgment responds to a summary judgment motion but fails to address the substance of any challenge to particular claims, that failure constitutes an abandonment of those causes of action and essentially acts as a waiver of these issues." (cleaned up)); *Nykiel v. Borough of Sharpsburg*, 778 F. Supp. 2d 573, 588 (W.D. Pa. 2011) (Lancaster, C.J.) ("Failing to respond constitutes an abandonment of those claims." (citations omitted)).

Finally, even if Mr. Kettren had not waived his hostile work environment claim, the co-worker comments identified by Mr. Kettren—mostly complaints by co-workers about their own increased workload due to Mr. Kettren's light duty—were not sufficiently "severe or pervasive" to support such a claim. *Cf. Wright v. Providence Care Center, LLC*, 822 F. App'x 85, 97 (3d Cir. 2020) ("Occurrences such as being ignored, told once to 'shut up,' hearing an offhand comment about collecting disability, being temporarily pulled to work on another floor at the facility, receiving a marginally negative performance review without cause, and scheduling annoyances, while no doubt unpleasant, are not objectively 'extreme,' as is required for a viable ADA hostile workplace claim.").

For these reasons, the Court enters summary judgment in favor of Verizon on Mr. Kettren's ADA discrimination or hostile work environment claim (Count I), as well as the corresponding disability-discrimination or hostile work environment portion of Mr. Kettren's PHRA claim (Count III).[4]

## II. Mr. Kettren has failed to establish causation or pretext as to his retaliation claims.

Verizon is also entitled to summary judgment on Mr. Kettren's retaliation claims, because he has failed to present evidence of causation or pretext.

In analyzing Mr. Kettren's retaliation claim, the Court applies the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Jakomas v. City of Pittsburgh,* 342 F. Supp. 3d 632, 642 (W.D. Pa. 2018) (Hornak, C.J.). Thus, Mr. Kettren bears an initial burden of presenting a *prima facie* case of retaliation. To establish a *prima facie* case of retaliation under the ADA and PHRA,[5] Mr. Kettren "must show (1) protected employee activity, (2) adverse action by the employer either after or contemporaneous with the employee's protected activity, and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Yanoski v. Silgan*

---

[4] In addition to his allegations of a hostile work environment, the "discrimination" count of Mr. Kettren's complaint also alludes in passing to his requesting of a "reasonable accommodation." But it does not articulate any ADA "failure to accommodate" claim or otherwise allege that Verizon denied any of Mr. Kettren's requests for time off or light duty work. Thus, the Court does not construe Mr. Kettren's complaint as asserting any such claim.

[5] In all relevant respects, the PHRA is coextensive with the ADA, and so the same standard applies to both of Mr. Kettren's claims. *See Katz v. UPMC*, No. 16-1627, 2019 WL 3843041, at *5 (W.D. Pa. Aug. 15, 2019) (Cercone, J.) ("Pennsylvania courts construe the parallel provisions of the PHRA to be coextensive with their federal counterparts. … The PHRA should be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language justifying a different construction." (cleaned up)), *aff'd*, 835 F. App'x 664 (3d Cir. 2020).

*White Cap Americas, LLC*, 179 F. Supp. 3d 413, 425 (M.D. Pa. 2016) (citation omitted).

Once Mr. Kettren has presented a *prima facie* case, the burden shifts to Verizon to articulate a non-discriminatory explanation for its actions. *Id.* If it manages to do so, the burden then finally returns to Mr. Kettren, who must present evidence that casts doubt on Verizon's proffered explanation, such that a jury could reasonably conclude that the explanation was merely a pretext for unlawful discrimination. *Id.* at 425-26. To establish pretext, Mr. Kettren must point to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence … and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (cleaned up).

With respect to his *prima facie* case, Mr. Kettren alleges that he engaged in protected activity by "request[ing] the reasonable accommodation of light duty following a surgery connected to his condition." ECF 1, ¶ 70. The Court agrees. A good faith request for a reasonable accommodation constitutes protected activity under the ADA and PHRA. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003) ("The right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC, and we have already explained that the ADA protects one who engages in the latter activity without regard to whether the complainant is 'disabled.'"); *see also Sowell v. Kelly Servs., Inc.*, 139 F. Supp. 3d 684, 700 (E.D. Pa. 2015) ("A leave of absence for medical treatment may constitute a reasonable accommodation under the ADA.") (citations omitted); *Wilson v. Lemington Home for the Aged*, 159 F. Supp. 2d 186, 201 (W.D. Pa. 2001) (Ambrose, J.) ("A number of courts have recognized that leave of absence for

medical treatment may constitute a reasonable accommodation under the ADA.") (citations omitted).

As for the "adverse action" prong of his *prima facie* case, Mr. Kettren alleges in his complaint that he was subjected to "repeated comments from co-workers," "suspensions," and, ultimately, "termination." ECF 1, ¶¶ 57, 60.

The first of these examples—negative comments from Mr. Kettren's co-workers—is just a restatement of Mr. Kettren's hostile work environment theory, which, as discussed above, he has now withdrawn, forfeited, and failed to substantiate. But in any event, "[g]eneral hostility and comments do not qualify as actionable adverse employment actions unless the hostility was severe and pervasive." *Griffin v. Potter,* 356 F.3d 824, 829 (7th Cir. 2004) (citation omitted); *see also Moore v. City of Philadelphia,* 461 F.3d 331, 346 (3d Cir. 2006) ("[A]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." (citations omitted)); *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1216 (10th Cir. 2010) ("[T]hese alleged snubs, though surely unpleasant and disturbing, are insufficient to support a claim of retaliation under our case law." (citations omitted)); *Recio v. Creighton Univ.*, 521 F.3d 934, 940 (8th Cir. 2008) ("[T]he instances of ostracism that Recio experienced amount to no more than 'nonactionable petty slights' under *Burlington Northern*." (citation omitted)).

Of course, suspensions and termination are adverse employment actions. But Mr. Kettren cannot establish either causation or pretext as to those. That is, Mr. Kettren has presented no evidence that causally links his suspensions or termination

to his protected activity (*i.e.*, his requests for time off and light duty), and he has also failed to cast doubt on Verizon's explanation of its decision.[6]

### A. Mr. Kettren fails to present evidence that he was suspended in retaliation for requesting a reasonable accommodation.

Beginning with the suspensions, Verizon contends that, in December 2018, Mr. Kettren was suspended on two separate occasions because he failed to follow Verizon's call-off procedures or report to work. These suspensions are documented by contemporaneous communications and consistent with Verizon's progressive discipline policies. ECF 37-1, Exs. 9, 10; ECF 37-2, Ex. I, J, K. Further, Mr. Kettren does not point to any evidence of suggestive timing for the suspensions in relation to his request for an accommodation, or to any relevant pattern of antagonism related to his suspensions.

Indeed, in his brief opposing summary judgment, Mr. Kettren does not dispute that he failed to follow Verizon's call-off procedures or, for that matter, make any argument that his suspensions were retaliatory. *See* ECF 40, p. 2 ("Plaintiff does not disagree. By way of further response, pursuant to the provisions of the Verizon Attendance Policy, if Mr. Kettren had one more unapproved absence, he would have

---

[6] Verizon's argument that Mr. Kettren fails to establish a *prima facie* case is intertwined (and essentially coextensive) with its argument that he fails to establish pretext. Given that, it is most natural to combine the analysis, and examine the evidence as it bears on both Mr. Kettren's *prima facie* case and the existence of any pretext. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000) ("[E]vidence supporting the *prima facie* case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other."); *cf. Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990) ("Kraft's claim that Weldon cannot establish a *prima facie* case is intertwined with its assertion that Weldon's poor performance evaluations constitute a legitimate reason for the discharge."); *Carroll v. Tompkins Rubber Co.*, No. 92-6457, 1993 WL 195472, at *5 (E.D. Pa. June 8, 1993) ("Because Tompkins Rubber's argument that Carroll cannot make a prima facie case is intertwined with its assertion that Carroll's repeated insubordination was a legitimate reason for the discharge, we will assume, for the purposes of analysis, that Carroll has made out the *prima facie* case and shift our lens to analyze the pretext issue."), *aff'd*, 16 F.3d 402 (3d Cir. 1993).

been terminated."). To the contrary, the record evidence reflects a history of accommodation by Verizon, which provided Mr. Kettren with extended leaves of absence and authorized light-duty assignments that went so far as to exempt Mr. Kettren from performing many of the core functions of his job. ECF 44-1, 60:13-61:12, 62:21-67:16; ECF 37-1, Exs. 3, 4, 6; ECF 37-2, ¶¶ 12-13, Ex. F.

For these reasons, Mr. Kettren has failed to establish causation or pretext related to his suspensions and, further, he has forfeited any retaliation theory based on his suspensions by failing to respond to Verizon's summary-judgment arguments.

**B.   Mr. Kettren fails to present evidence that he was fired in retaliation for requesting a reasonable accommodation.**

Mr. Kettren also cannot establish causation or pretext as to Verizon's termination of his employment.

Verizon says that Mr. Kettren was terminated for refusing to take a drug test required by Verizon's collective bargaining agreement and corporate policies, after his manager, Joshua Claycomb, found him asleep and behaving strangely in the "ready room" at the start of his shift. If true, that would constitute a legitimate and nondiscriminatory reason to fire an employee. *See McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) ("[W]orkplace misconduct is a legitimate and nondiscriminatory reason for terminating employment[.]"). So, the question is whether Mr. Kettren has presented evidence that could link his firing to his protected activity (*i.e.*, his requests for accommodation) or otherwise cast doubt on the truthfulness of Verizon's explanation. He has not.[7]

---

[7] Mr. Kettren does not argue that the timing of his termination was inherently suggestive of causation or pretext here. *See Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) ("In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection."). Nor could he, as his protected activity, *i.e.*, his requests for time off and light duty, preceded his firing by over a month. *See Schofield v. Metro. Life Ins. Co.*, 252 F. App'x 500, 504 (3d Cir. 2007) ("Here, the month between Schofield's return and the Tinsley investigation,

Mr. Kettren first argues that causation and pretext can be inferred from Mr. Claycomb's failure to cancel the scheduled drug test after Mr. Kettren reported being diagnosed with mononucleosis at the hospital. ECF 40, p. 8. At his deposition, Mr. Claycomb explained that he proceeded with the drug test because he did not believe the symptoms he had observed that morning were consistent with illness. ECF 44-2, 21:9-23:24, 49:11-52:25. For his part, Mr. Kettren denies that he was asleep at any point in the "ready room," but admits that he was visibly ill and that he told Mr. Claycomb he needed to go to the hospital.

The Court finds that any dispute as to the symptoms Mr. Kettren was exhibiting is ultimately not material. That is, while the parties dispute whether Mr. Kettren, in fact, fell asleep in the "ready room," there is no question that he was, at a minimum, visibly ill to such an extent that both he and Mr. Claycomb felt he needed to go to the hospital emergency room. What's more, the issue here is not whether Mr. Kettren has cast doubt on the *correctness* of Mr. Claycomb's suspicions or of his decision to proceed with the drug test, but only whether there is reason to doubt that Mr. Claycomb and Verizon have provided "an honest explanation of [their] behavior." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995); *see Frymoyer v. E. Penn Mfg. Co., Inc.*, 757 F. App'x 97, 101 (3d Cir. 2018) (employee must show that employer "did not have an honest belief that he engaged in misconduct justifying termination."); *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 647 (3d Cir. 2015) ("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." (cleaned up)).

Given the symptoms Mr. Claycomb observed—and given that he had already scheduled the drug test before Mr. Kettren was released from the hospital—his

---

during which both Pidich and Tinsley covered for Schofield during absences necessitated by his illness, is antithetical to conduct 'unusually suggestive of retaliatory motive.'").

refusal to cancel the test once Mr. Kettren informed him of his diagnosis was not so unreasonable as to not render Verizon's explanation inherently "weak, inconsistent or incoherent." *Darby v. Temple Univ.*, 786 F. App'x 368, 370 (3d Cir. 2019). Beyond that, there is no independent evidence casting doubt on the genuineness of Mr. Claycomb's belief. Plus, the alternative just doesn't make sense. That is, if Mr. Claycomb did not have a genuine belief that Mr. Kettren was under the influence of drugs, a drug test would not be an effective pretext for orchestrating a discriminatory firing—the test would come back negative, and thus bolster, rather than undermine, Mr. Kettren's excuse.

Along those same lines, it bears emphasis that Verizon *did not* claim to fire Mr. Kettren based on any determination that he was, in fact, under the influence of drugs. Rather, it fired him for *refusing a drug test*, after a third-party contractor listened to Mr. Claycomb's explanation and agreed that there was reasonable suspicion to require it. For better or worse, Verizon's collective bargaining agreement requires employees to submit to such tests, on pain of termination, and it is undisputed that Mr. Kettren refused to do so. Thus, until the very end, Mr. Kettren retained the power to save his job by simply submitting to the test. In that sense, too, the facts here are not consistent with a narrative of an employee pushed out of his job for pretextual reasons.

Mr. Kettren separately argues that causation and pretext can be inferred from the fact that Mr. Claycomb did not wait for a union representative to arrive before directing Mr. Kettren to proceed with the drug test. That is, Mr. Kettren argues that Verizon's explanation for his firing is suspect because "Mr. Claycomb had the ability to summon [a] union representative, should he have wanted to, or waited thirty minutes for a union representative to arrive." ECF 40, p. 8. But Mr. Kettren testified that both he and Mr. Claycomb attempted to contact the union president, that Mr. Kettren ultimately spoke to the union president, and that the union president told

Mr. Kettren he was busy with work and would not attend the drug test. ECF 44-1, 137:19-138:4. Given that, the absence of a union representative has been explained and is not indicative of pretext.

Indeed, even assuming Mr. Claycomb could or should have made more of an effort to find an available union representative, that would not tend to suggest that Mr. Kettren was fired *for reasons other than* his refusal to take the drug test. Rather, it would at most allow an inference that Mr. Claycomb was perhaps harsher than he could have been. That is not enough to show pretext. *See Brewer*, 72 F.3d at 332 ("No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," the appropriate inquiry is limited to "whether the employer gave an honest explanation of its behavior." (cleaned up)).

Finally, Mr. Kettren argues broadly that "[d]eterminations of intent are sometimes not easily made at summary judgment[.]" ECF 40, p. 9. True enough. But his burden was to point to specific *facts,* backed by *evidence*, that a jury could rely on to draw the necessary inferences about Verizon's intent. Since his other arguments fall short, Mr. Kettren cannot seek refuge in generalities about the difficulty of inferring intent.

For these reasons, Verizon is entitled to summary judgment on Mr. Kettren's retaliation claims.

## CONCLUSION

For all the reasons discussed above, the Court will grant summary judgment to Verizon on all of Mr. Kettren's claims. An appropriate order follows.

DATE: June 16, 2021                 /s/ *J. Nicholas Ranjan*
                                                                               United States District Judge